Good morning, and may it please the Court. Amy Saharia of Williams & Connolly for Appellant Liberty Tax. The District Court erred in granting summary judgment to defendant on both Liberty Tax and the defendant's counterclaim for breach of contract against Liberty Tax. If I may, let me start with Liberty Tax's claim for breach of contract, which is that the defendant breached the party's purchase and sale agreement by failing to assign five leases to Liberty Tax in 2019. The evidence before the District Court at summary judgment regarding the circumstances of those five leases was sufficient for a jury to find for Liberty Tax on the three key issues on appeal. First, that Liberty Tax requested assignment of those leases in December of 2019. Second, that Liberty Tax did not waive its right to request assignment of the leases. And third, that Liberty Tax retracted any waiver when it demanded assignment in 2019 before the defendant had materially changed his position because he had been subletting those leases. Why didn't they waive given that they expressly declined to take over some of the leases in 2016 and then waited nearly three years before asking to do so? So I think as to express waiver, the Court can look at the five leases in three categories because the communications relate to those five leases in different ways. The first category are the two that were not on Schedule C of the party's agreement. Those are the Allerton Ave property and the Adam Clayton Boulevard property. And as to those two properties, the most that we have in the email communications is Liberty Tax's employees saying she's not aware of any other properties that Liberty Tax wanted to assume, but that she would check with her team. And I don't think that statement is the kind of clear, unequivocal, and precise evidence of a waiver that the law demands. As to the three remaining properties which are on Schedule C, I think those fall again into two different categories. The one that I would admit is the hardest for us is the Westchester Avenue property. That's the one where in July of 2016, Mr. Shahabudin's counsel asks whether he can proceed to dispose of that lease, and Liberty Tax responds, yes, we are not moving forward with that one. That's at JA 198. Now I think in the full circumstances of the case, including the fact that another Liberty franchisee took over these five leases, a jury could look at all of those circumstances and understand that was not precise evidence of an intent to waive forever. But I think that's the hardest one. The remaining two are the Fordham Road and Willis Ave. properties. And as to those properties, in November of 2016, the correspondence was simply, Liberty not taking. And we know from the record below at the argument before the magistrate judge, counsel for the defendant, conceded that Under your theory, how long did Apelli have a duty to hold on to the leases? In the circumstances of this case, so long as Mr. Cebulski, the Liberty franchisee, was still in those properties doing work for Liberty Tax in those properties. So indefinitely? Indefinitely, so long as the franchisee was there. I think I would have a much harder argument, I'm not sure I would even be here, if there was no Liberty franchisee in those properties, to say that if he had disposed of those properties, if he had installed a new business in those properties, I don't think it would be reasonable for Liberty Tax to come in three years later and say, we've changed our mind, we want them back. What makes this case so unique, both in terms of whether this was an express waiver, whether this was a reasonable time, and whether Liberty, frankly, reasonably retracted any waiver in 2019, is the fact that during that time period, there was another Liberty franchisee subletting these leases from the defendant until December of 2019. That's a critical circumstance in this case, because there was no material change in position from the defendant. He had not disposed of the leases, he was subletting them to a Liberty franchisee. The purpose of this provision was to allow Liberty to maintain its goodwill in those properties. It was doing that by having a franchisee there subletting from the defendant. And it was only once that franchise relationship with Mr. Cebulski terminated at the end of 2019 that Liberty needed to go in and request the assignment at that time. Now, on the issue of the request for the assignment, there is, I think, ample evidence in the record that Liberty did make that request in December of 2019, notwithstanding the magistrate's conclusion below. I would point the court to three locations in the JA where that is clear. First, Mr. Brashear's deposition testimony, which is at JA 232 and JA 360, where he says in his deposition that Liberty tax requested assignment in December 2019, and that in a December 2019 conversation, counselor for the defendant said the defendant refused to assign the leases. The second is Mr. Brashear's declaration from April 2020. This is a declaration that had been filed earlier in this case at the TRO stage at JA 113. The magistrate judge expressly referenced that declaration in his report and recommendation and that argument on the motion. Liberty tax then refiled it with its objections at JA 888. But there, again, very clearly, Mr. Brashear said that in December 2019, he spoke with the lawyer for the defendant. Can I go back to Judge Thacker's question about how long the leases were to remain available for transfer? The language of the PSA talks about a closing date and it suggests that once these documents are executed, that the transfer of assets . . . I mean, it implies that it should occur pretty close to the time of the closing date. The magistrate judge and the district court relied on that language to suggest that there just wasn't reasonable to believe that these leases would remain open for the time period that you suggest. So what about that? So the magistrate judge concluded that the PSA meant that all of the assets needed to be assigned by the time of the closing. For the reasons that we put forth in our brief, I don't think that's the best reading of the PSA. I think the PSA does contemplate that there will be some discussion or work around the leases even after closing. For instance . . . Three years worth of discussion? Well, I think that's a separate question. So I think whether you think we're right about when the closing occurred or whether you think the magistrate judge is right about when the closing occurred, I don't think answers the ultimate question. And Your Honor's question is the ultimate question, is was three years a reasonable time in the circumstances of this case? And I think, again, as to these five leases, it was a reasonable time because of the fact that there was a Liberty franchisee in those locations. The cases look at a variety of factors and say that it's usually the jury's job to weigh those various factors. Those factors are the purpose of the contractual provision. And here the purpose of the contractual provision is obviously to allow Liberty to maintain its goodwill in its franchise locations that, in many cases, it had held for more than a decade. And it did achieve that purpose in the short term by having another franchisee sublet those locations from the defendant. But once that franchisee left those locations, it became necessary at that time for Liberty to promptly, as it did, request assignment from the defendant. So that's one factor that courts look to. When we're talking about retraction of any waiver, let's say there was an express waiver in 2016, and the question is can Liberty retract that waiver, courts look at whether there's been a material change in position by the counterparty such that the party who had weighed would be stopped from retracting that waiver. And here there's just no evidence of a material change in position or, at a minimum, a jury could find there was no material change in position, precisely for the same reason that there was a Liberty franchisee subletting from the defendant. He had not, as of December 2019, installed his competing tax businesses in those locations. He had not disposed of the leases. He still had the leases, and we know that because in January of 2020, he signed five agreements temporarily allowing Liberty to stay in those locations until April of 2020. And it was in April of 2020 when he then gave those leases to someone else to run a competing business. So I think all of those factors are factors that a jury could look at to conclude that in the circumstances of this case, on these facts, on this fact-intensive record, that it was reasonable for Liberty to ask after three years. Now, if I may just briefly turn to the counterclaim there, I would make two points. The first is that these, the question on the counterclaim is whether the definition of net revenue in the party's PSA, which was carried forward to the settlement agreement, includes the e-filing fees. And there's really two points there. The first is that e-filing fees, a jury could conclude, are not net revenue received for the offices and the territories, because as explained in a declaration of Liberty's employee, they are not fees that are generated at the office locations. They are a separate kind of fee that is generated by Liberty, the franchisor, and then only a portion of that fee is remitted to the franchisees. Why were they included in the spreadsheet as gross fees, then? The spreadsheet included gross fees that were related to all of those locations, but they were the reason Liberty subtracted them out of the spreadsheet. Because it didn't want to pay them. Well, it didn't want to pay them because they weren't the same kind of fees that it believed qualified as net revenues. It subtracted them out precisely because these were Liberty fees, not franchise fees, unlike, by the way, everything else that is identified in the definition of net revenue in the PSA. The franchisees are the ones that receive fees from customers. The franchisees are the ones that then expense money back to customers through things called cash in a flash and send a friend, all of the things that are identified in that definition. And so I think if you look at that definition as a whole, you can understand that these are the fees were contemplated to be fees that were fees generated at the locations, not fees that Liberty, the franchisor, itself collected. At a minimum, we think there's a dispute as to what the right amount is because, as explained in the Declaration of Liberty's employee, a portion of that $432,000 would have been remitted back to the franchisee, but not the entire amount. Well, as to the electronic filing fees in the agreement, and somebody testified that electronic filing fees are not expenses like discounts, cash in a flash, send a friend, or uncollected fees, so if it wasn't excluded as cash in a flash, et cetera, why isn't it part of the net revenue? Well, our position is it's not part of net revenue because net revenue starts with the gross fees that are received for the office locations before you start subtracting those other expenses, and these don't qualify as gross fees received for the office locations because they are fees received for Liberty, the franchisor, not for the office locations. Now, the second issue that I would just briefly address with respect to the counterclaim is the issue of accord and satisfaction. We do think a jury could reasonably read the party's email correspondence that addressed this issue and concluded that Liberty made clear its intent to proffer this amount in full settlement of the outstanding debt under the settlement agreement. Let's assume that electronic filing fees are recoverable by the other party. It seems to me those fees are liquidated, and so, therefore, accord and satisfaction would not apply. I think to the opposite, Your Honor, because there was a legitimate dispute between the parties, the settlement agreement did not specify a liquidated amount. It gave, it referred the parties to the definition of net revenues in the PSA. But isn't the 10% share thereof readily attainable from Liberty's own records? Well, only if it's clear from Liberty's own records what qualifies as net revenues, and there's a dispute, in our view, a bona fide dispute. Instead of assuming that electronic filing fees are part of the net revenues, make that assumption. Sure. I may have missed that part of the question. So just for assuming that, then there is testimony in the record that that 10% share is readily attainable from Liberty's own records, and making your defense kind of inapplicable, doesn't it? I think if you assume, you have to assume two things. You have to assume that the e-filing fees are part of net revenue, and you have to assume that there could be no even bona fide dispute about whether that is true. As long as there's a bona fide dispute about whether it's true, then I think the debt is still unliquidated. In calculating those fees, the only thing that's considered, as I understand the record, are your records. So what is the dispute if it's your records? The dispute is what is the term gross fees received for the offices and the territories mean in the first place? And our record contains both. I'll give you that, but assume you're wrong in getting to the second point. Is there any other evidence other than your own records that determine the amount of the electronic filing fees? Well, our record is the spreadsheet in which Liberty deducted those fees from the due to the defendant based on Liberty's interpretation of the PSA and the settlement agreement that those do not count. There's no dispute about what the amount of the e-filing fees are. That's in the spreadsheet. That's the point I'm trying to get to. If you're wrong about the electronic filing fees, then the amount is liquidated as per your own records, and accord and satisfaction would not apply. It, yes, so long as there's not a bona fide disagreement about whether they qualify. There's an even more fundamental problem is that you didn't raise this defense until we are in our stage. And so the district court in its discretion decided not to consider it. So why should we? It's unclear whether the district court declined what the district court decided. The district court didn't address it. It did address other arguments. We know it wasn't raised until the R&R stage, right? That's correct, Your Honor. I think that this issue clearly falls within an argument that goes to a preserved issue that this court held in both George and samples. A district judge does need to consider at the R&R stage. And I think the best evidence of that is if the court looks at George. One of the issues in George was a criminal case, so it's a little bit different. But one of the arguments that the government raised at the R&R stage in George was whether suppression was not required because of the inevitable discovery exception to the exclusionary rule. That's an exception on which the government bore the burden of proof, much like an affirmative defense. And this court held that the district judge needed to consider that argument at the R&R stage. We think this defense is very similar to that. And I would note the defendant did not object below to this issue being before the district court. He simply responded on the merits to the issue at the R&R stage. All right. Thank you. Mr. Harvey? Your Honors, may it please the Court. My name is James Harvey from Woods Rogers Van Deventer Black on behalf of Mr. Shahab Budin. Your Honors, typically civil cases, contract cases present some even arguable factual issue. What is remarkable in this case is the utter dearth of facts in the record to support the in defense of its summary judgment motion. The evidence that supported the only conclusion the district court could make included the agreement drafted by Liberty, the clear written exchange between its in-house counsel and counsel for Mr. Shahab Budin in 2016 affecting the purchase and sale agreement, the sworn testimony of Liberty's CEO who approved of, negotiated, and signed the agreement, and the deposition testimony of Liberty's representative, its treasurer, Mr. Brashear. No facts are in dispute that Liberty gave explicit language of a waiver, implicit language based on the agreement and the actions of the parties of a waiver for any right of assignment to the subject properties in 2016, which is the operative time. This case is really just a test for this court to see if it's going to go back on its prior decisions and that of the Supreme Court that, and permit a party to attempt to create a disputed fact where none exists when it attempts to differ its sworn testimony. Then why was appellant's assignment right preserved in paragraph 4A of the 2018 settlement agreement? Doesn't that show that the parties understood that appellant's assignment obligation remained? Your Honor, I think the district court aptly described that obligation. That obligation arose in the representations and warranties section of the purchase and sale agreement. What is notable is that the obligation, the separate obligation to assign and transfer these leases were superseded by the settlement agreement. The representations and warranties were effective as of two dates, as plainly stated in the purchase and sale agreement, the date of execution and the date of closing. They serve a simple purpose, to prevent a fraud or some type of misstatement of fact to be relied upon by the buyer at closing. Namely, that you will take certain actions, you're going to assign me these things by closing and that they're going to have good title. Those things don't go away in 2018. For instance, if the buyer discovered that one of the leases that it had been assigned was forged or fraudulent or didn't carry good title, then he could turn, Liberty could turn back at Mr. Shahabuddin and say, you breached this representation and warranty that you made effective at the time of the closing. That does not change. The 2018 agreement, as the court noted, does not create some new or renewed obligation to assign properties into the future. So here, all we have to attempt to create factual disputes is the liberty attempting to counter its own statements under oath with other statements under oath. This court in Barwick v. Selatex and Stevenson v. City, as well as Supreme Court in Cleveland, have all said that a party cannot create a genuine issue of material fact to survive summary judgment simply by contradicting his or her own sworn statement. That's what we have here in multiple contexts. So is your argument that Brashear's affidavit that he formally demanded assignment of the leases for the locations was too late? Your Honor, the timing... That the time at which he said he demanded was too late. I want to understand the contradictions between the sworn statement or are you saying that... Let me just ask, what is your rebuttal to Mr. Brashear's affidavit? He stated under oath during his deposition that he had no recollection of what occurred in any conversation in December of 2019 to demand a assignment of any leases. He has no recollection of referencing the purchase and sale agreement. He has no recollection of what was specifically said. Was that deposition before his affidavit? It was after his affidavit. We took that affidavit. We attempted to ask him the specifics of what occurred. Okay, so he had no specific recollection. No. His affidavit is pretty specific that he says he formally demanded that Appellee assign leases for the subject locations. Which is an interesting turn of phrase when he says he formally demanded. So of course, like any attorney, we ask, how did you formally demand? And he says, I have no recollection at that point. But I think we're going down a path that the district court said didn't matter at the end of the day. Whether or not there was a demand in 2019, those rights had already been waived back in 2016 by both the express and the implicit actions of the parties. And I guess that's where my question was going, that the demand was too late, is your argument. That's your argument. My first question. Okay. And so exactly in 2016, if you look at that, this is a unique situation. We know that waiver requires proof of knowing an intentional waiver of a known right. And here, there's definitive contemporaneous written exchange demonstrating a clear and express knowing waiver. And the principles on both sides of this transaction in 2016 agree that it was intended to act as a waiver. These issues are not in dispute. And Liberty presented no evidence to the district court to counter what was presented on summary judgment. The language of the PSA, the language that Liberty relies upon is that representations and warranties. And that makes sense because it carries forward about what was known at the time of the transaction. What can we rely upon going forward? It doesn't constitute some continuous obligation. Instead, the parties acted clearly, expressly over a close period of time between the end of June 2016 and December 4th, 2016 to transfer to effect the closing, the purchase and sale agreement resulting in a wire transfer. A wire transfer of the rent payments for those properties that were assigned for June and July of 2016. So what's the... And it's important to understand that when Liberty says that we are not taking these leases and that you are free to dispose of them, they're not saying wait and hold on and get somebody else's lease. This is not a favor to Mr. Shahabuddin. Instead, it's a burden upon him because he now has leases, he has property with no tenant. He's now stuck with property. He has to go find something to do. And what I'll say is that Liberty's argument here today is an extraneous fact not in the record. They now want to claim that because there was some other side lease, some sublease, that that excused them from their performance. But that's not in the record. What's in the record and they cite to is JA 946, 948, 949, which is the testimony of Mr. Brashear about subleases that existed to a Liberty franchisee in 2019, in December 2019. The record is devoid of any facts of actual subleases that existed in 2016. In fact, the district court, the magistrate judge rejected discovery on that topic before summary judgment was granted. That was not relevant to this dispute and we can see why. This is an agreement between two parties and whether or not one of those parties has another side agreement, that may motivate them to take certain actions, but it doesn't change their responsibilities as between Liberty and Shahabuddin. They may have their own reasons for what they did, but that does not change the obligations between the parties and there's no evidence in this record of these subleases. Instead, what is in the record is that Mr. Shahabuddin had control of many franchises at the purchase and sale agreement, some 37. He assigned exactly the ones that were requested. The others were not. There was clear language in June and July that he was not going to take the 2168 property. There was a request for properties not on Exhibit C, those intended to be transferred, and counsel followed up. What other ones do you want? And counsel for Liberty, its own employees, said, we are not aware of any. I'll let you know. But it's not like this was on a list where anybody could follow up and say, what about this one? What about that one? These were ones never intended to be assigned, these last two. There was a clear statement, not aware of any. I'll let you know if we want them. Never happens in December. Until three years later. Exactly. Until three years later. But closing, the last of the assignments, and the PSA defines when closing occurs, which is the submission of these assignment forms. The last one occurs in December 2016. That's when the transfer, the wire transfer happens, consideration that affects that closing. So during the period of closing, the parties had a clear expectation of what was to occur. And their CEO expressly stated under oath that once that occurred, they had no expectation that these leases be held open in the future. The CEO of Liberty stated, it did not expect Mr. Shahabuddin to keep them available for assignment indefinitely into the future. This is not contradicted. There's no factual evidence otherwise. That's expressed language.  of the purchase and settlement agreement that was signed by the CEO of Liberty. which provides specific actions to be taken upon closing. There's no other obligation. Liberty would have this court read new terms into that purchase and sale agreement. Purchase and sale, assign to us everything now, and by the way, keep holding on to things in case we are in, you have a subtenant franchisee of ours. That's the argument Liberty now makes is they want to insert additional language into this purchase and sale agreement that exists nowhere. And the statement that there was no change in position is also not indicative of what's in the record. Mr. Shahabuddin at the time of transfer in 2019 was only the lessee of one of these five properties. In the interim, other wholly owned or other special purpose entities had taken new or renewed leases on four of the five properties. Because of his intent to have other commercial ventures there. So he is not even the lessee of four of these five properties in 2019. The court, there was ample evidence to say that of course he has a changed position, but it doesn't matter. Retraction is not available, of a waiver is not available in Virginia. So as the district court found in 2016, relying on Franklin Plant Farm v. Nash, when there is a non-continuous obligation, you can't later retract a waiver of that obligation. The right to consent in that case, the right to consent or object to a lease assignment was not a continuous covenant, but a single act which once waived could not be retracted. The district court properly found these obligations in the purchase and sale agreement to assign these properties was just like in Franklin Plant Farm, a single act that once waived cannot be retracted. There's no other law in Virginia that would permit an ongoing obligation. And so it does not matter what happens in 2019 because once they waive it in 2016, once the CEO says I have no further use for this, I don't expect you to hold it open, you can't go back and undo that. With regard to the counterclaim, this is another example of trying to change the testimony to create a material fact. The material fact they now want to create is that the settlement agreement and the definition of net revenue that is referenced in the purchase and sale agreement means something other than the plain language on its face. It means something different than what Mr. Brashear testified to as the company's representative, as its treasurer. He testified that he knew exactly why Liberty did not pay electronic filing fees to Mr. Shahabudin. And that is not a reason that Liberty comes to this court today. The reason he stated under oath was because electronic filing fees didn't exist in 2016. Of course, that's a nonsensical argument as the court has already recognized. Net revenue is just gross revenue less these express discounts that are in the agreement. So whether or not there's some other form of income, it doesn't matter. They now want to say that, well, it's not for the franchises. But again, this contradicts Mr. Brashear's testimony. He was asked expressly, is this revenue for Liberty and its franchisees? And he said, yes. So they can't come now before the court and say that it's not revenue for the franchisees, so therefore it's not included. It doesn't make sense. With regard to the accord and satisfaction, as the court has noted, well, we can just look to the federal rules and find that accord and satisfaction is an affirmative defense. It wasn't raised. It was their obligation to do so. But as the court has also recognized, they don't meet the elements for accord and satisfaction in this case. We can at least take two of the three requirements in Virginia. So in Virginia, there are three requirements. That the amount be liquidated, that the amount be disputed, and that there must be sent a clear statement that the payment was made in full satisfaction. We don't have the first or the third. What they have now is they now want to dispute that the amount should be paid under the purchase and sale agreement despite their own spreadsheet. As the court noted, this is different than that conflates the dispute issue with a liquidated amount. And in here, the district court found that the exact sum was readily calculable by looking at the defendants, I mean, the Liberty Zone documents. So there's no dispute that it was a liquidated amount. Accord and satisfaction cannot apply. In addition, the court can look to the conversations between the parties and see that there was no clear statement or actions that this was made in full satisfaction so that it was free at that point to render summary judgment on this issue whether or not it had dealt with the accord and satisfaction issue. The elements just weren't there. The court properly acted to grant summary judgment and we asked the court to affirm the judgment of the district court. Thank you, Mr. Harvey. Mr. Harvey, you have some rebuttal. I'll be brief, Your Honor, because I know I went over in the opening argument. It is absolutely in the record that Mr. Cebulski was the franchisee was subletting these leases from the defendant. Mr. Brashear's earlier declaration, this is at JA 114, says that after the parties entered into the PSA, Liberty franchisee Mike Cebulski operated Liberty franchises from the subject locations. The magistrate judge asked counsel for the defendant about that at the hearing on the motions and counsel for the defendant represented at JA 803 that Mr. Cebulski began subletting those properties in November of 2016. That is the exact same time when Liberty and the defendant were emailing about what was going to happen with those final properties. And so when Liberty said it was not taking those properties, a jury could conclude from all of the circumstances, including the fact that Mr. Cebulski began subletting in November of 2016, that that was nothing more than a recognition that Cebulski was taking them, not that Liberty was forever waiving its right to assignment. Did Liberty say that was the reason? It is not reflected in the emails. The emails that just say Liberty not taking, but the standard for an express waiver is a demanding one. It requires clear, precise, and unequivocal evidence. And it allows the jury- Liberty not taking is pretty clear. I think the jury is entitled to look at all of the evidence, including the extrinsic evidence, to determine whether that was a clear and express waiver. And I think, again, because we know that at the same time, there is a Liberty franchisee that is going into those locations, a jury could conclude that was not an express waiver. Counselor relied very heavily on the affidavit of Liberty's fired CEO, John Hewitt. And on that, I would just note that his affidavit says that Liberty did not expect Mr. Shahabudin to keep these leases in perpetuity or indefinitely. And that's not the argument that we've presented to the court. There's no contradiction between that declaration, even if it had any credible evidentiary weight on this issue. And then just briefly with respect to the settlement agreement, counsel now suggests that some other provision of the PSA is the one that required transfer of the leases, but it's not what they argued below. They repeatedly pointed to Section 8E as the operative provision requiring transfer of the leases to the extent that all the parties intended to do at the settlement agreement was preserve other parts of 8E, including the representation about good title. The parties could have carved out that particular sentence as they did elsewhere in Section 4A of the settlement agreement. So for all those reasons, as well as the ones I previously articulated, we asked the court to reverse. All right. Thank you both for your arguments this morning. As you heard earlier, we typically come down and greet counsel. Not able to do that today, but hope to be able to do that in the near future. Thanks very much. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Henry F. Floyd